**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 13-4054-cv(L)    Caption [use short title]

**Motion for:** To hold appeal in abeyance

NML Capital, Ltd. v. The Republic of Argentina

Set forth below precise, complete statement of relief sought:

Order holding appeal in abeyance until the

United States Supreme Court issues its

decision in NML Capital, Ltd. v. Republic of

Argentina, No. 12-842, which is currently

pending before the Supreme Court and

involves a central legal issue in this appeal.

**MOVING PARTY:** Republic of Argentina    **OPPOSING PARTY:** NML Capital, Ltd.

☐ Plaintiff    ☑ Defendant
☑ Appellant/Petitioner    ☐ Appellee/Respondent

**MOVING ATTORNEY:** Carmine D. Boccuzzi    **OPPOSING ATTORNEY:** Theodore B. Olson

[name of attorney, with firm, address, phone number and e-mail]

Cleary Gottlieb Steen & Hamilton LLP

1 Liberty Plaza, New York, NY 10006

212-225-2000 / cboccuzzi@cgsh.com

Gibson Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W., Washington, D.C. 20036

202-955-8500 / tolson@gibsondunn.com

Court-Judge/Agency appealed from: Honorable Thomas P. Griesa / S.D.N.Y.

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?    ☐ Yes ☐ No
Has this relief been previously sought in this Court?    ☐ Yes ☐ No
Requested return date and explanation of emergency:

Is oral argument on motion requested?    ☐ Yes ☑ No    (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No    If yes, enter date:

**Signature of Moving Attorney:**
_____ **Date:** 1/17/2014    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

/s/ Carmine Boccuzzi

**Form T-1080** (rev. 12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

-----------------------------------------------------------X
                          :

NML CAPITAL, LTD.,              :

                        :

        Plaintiff-Appellee,      :      13-4054-cv(L)

                        :

        - v. -                :

                        :

THE REPUBLIC OF ARGENTINA,  :

                        :

        Defendant-Appellant.   :

                        :

                        :
-----------------------------------------------------------X

### MOTION OF DEFENDANT-APPELLANT THE REPUBLIC OF ARGENTINA TO HOLD APPEAL IN ABEYANCE

Defendant-Appellant the Republic of Argentina (the "Republic")

hereby moves to hold in abeyance this appeal of an Order of the district court, dated

September 25, 2013, pending the decision of the United States Supreme Court in

*NML Capital, Ltd. v. Republic of Argentina*, No. 12-842.[1]  The Supreme Court

granted the Republic's petition for a writ of certiorari on January 10, 2014, and we

expect the case to be decided in the 2013-2014 term.  *See NML Capital, Ltd. v.*

*Republic of Argentina*, No. 11-4065-cv(L), Dkt. # 218.  The question to be

considered by the Supreme Court concerns the propriety of a post-judgment

discovery order like the one at issue in this appeal.

---

[1] The decision to be reviewed by the Supreme Court in *NML Capital, Ltd.* was
captioned in this Court as *EM Ltd. v. Republic of Argentina*, 695 F.3d 201 (2d Cir.
2012).

# ARGUMENT

The Republic's appeal concerns an Order entered by the district court that compels the Republic and various third-party banks to produce to plaintiffs documents and information in purported aid of executing on judgments against the Republic, regardless of whether that information concerns property immune from attachment and execution under the Foreign Sovereign Immunities Act ("FSIA").[2] Ex. A.  In entering the Order, the district court relied on this Court's decision in *EM Ltd.* – which held, in express disagreement with the Seventh Circuit, that the FSIA "does not affect" discovery concerning sovereign property, 695 F.3d at 209 – and rejected the Republic's argument that plaintiffs' discovery requests run afoul of the FSIA because they are not tailored to property plausibly subject to attachment or execution.  The Republic timely appealed the Order on October 24, 2013, and its opening brief is currently due on February 6, 2014.

---

[2] This motion applies only to the Republic's 23 appeals from the September 25, 2013 Order, which were docketed under case numbers 13-4054, 13-4059, 13-4063, 13-4068, 13-4075, 13-4082, 13-4085, 13-4086, 13-4088, 13-4089, 13-4090, 13-4109, 13-4110, 13-4112, 13-4114, 13-4116, 13-4118, 13-4119, 13-4120, 13-4122, 13-4123, 13-4124, and 13-4125, and are currently consolidated under lead case 13-4054.  The Court *sua sponte* consolidated certain of these appeals with other unrelated appeals from a separate order of the district court, entered on October 3, 2013.  A motion to deconsolidate those separate appeals (13-4213, 13-4227, 13-4229, 13-4237, 13-4248, 13-4269, 13-4270, 13-4349, 13-4353, and 13-4360) is currently pending before the Court.  This motion does not apply to those cases.

Just last week, on January 10, the United States Supreme Court granted the Republic's certiorari petition seeking review of this Court's ruling in *EM Ltd.* that post-judgment discovery concerning foreign-state property is not limited by the FSIA. Specifically, the question presented in the petition granted by the Supreme Court is:

> Whether post-judgment discovery in aid of enforcing a judgment against a foreign state can be ordered with respect to all assets of a foreign state regardless of their location or use, as held by the Second Circuit, or is limited to assets located in the United States that are potentially subject to execution under the FSIA, as held by the Seventh, Fifth, and Ninth Circuits.

Ex. B at i.

The Republic respectfully requests that the Court hold this appeal in abeyance because the Supreme Court's ruling on the question presented in *NML Capital, Ltd.* will determine the legal rule for this Court to apply when resolving a central issue in the appeal – whether the Order contravenes the FSIA – and could otherwise narrow or eliminate other issues. *See United States v. Bahel*, 662 F.3d 610, 622 (2d Cir. 2011) (appeal held in abeyance pending "the Supreme Court's determination of the merits" in case that would impact appeal); *Maldonado v. Flynn*, 671 F.2d 729, 731 (2d Cir. 1982) (appeal "held in abeyance pending a determination by the Supreme Court of Delaware of a related appeal involving the same parties" that "for the first time reviewed the law and the procedures to be followed in cases of [the same] type"). Briefly holding the appeal in abeyance

until the Supreme Court rules will promote judicial economy and preserve the resources of both the Court and the parties.

Accordingly, the Republic respectfully requests that the Court enter an Order holding the appeal in abeyance for a brief period – specifically, 45 days from the Supreme Court's decision in *NML Capital, Ltd.*, which we expect to be issued by the end of June.

Dated:  New York, New York
        January 17, 2014

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:____/s/ Carmine Boccuzzi____
    Jonathan I. Blackman (jblackman@cgsh.com)
    Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for the Republic of Argentina

4

# EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/25/2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

NML CAPITAL, LTD.,

    Plaintiff,

v.

THE REPUBLIC OF ARGENTINA,

    Defendant.

| | |
|---|---|
| : | 03 Civ. 8845 (TPG) |
| : | 05 Civ. 2434 (TPG) |
| : | 06 Civ. 6466 (TPG) |
| : | 07 Civ. 1910 (TPG) |
| : | 07 Civ. 2690 (TPG) |
| : | 07 Civ. 6563 (TPG) |
| : | 08 Civ. 2541 (TPG) |
| : | 08 Civ. 3302 (TPG) |
| : | 08 Civ. 6978 (TPG) |
| : | 09 Civ. 1707 (TPG) |
| : | 09 Civ. 1708 (TPG) |

------------------------------------------------------------ x

AURELIUS CAPITAL PARTNERS, LP and
AURELIUS CAPITAL MASTER, LTD.,

    Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

    Defendant.

07 Civ. 2715 (TPG)
07 Civ. 11327 (TPG)

------------------------------------------------------------ x

AURELIUS CAPITAL MASTER, LTD. and
ACP MASTER, LTD.,

    Plaintiffs,

v.

THE REPUBLIC OF ARGENTINA,

    Defendant.

09 Civ. 8757 (TPG)
09 Civ. 10620 (TPG)

**(captions continued on next page)**

------------------------------------------------------------ x

**ORDER**

```
----------------------------------------------------- x
AURELIUS OPPORTUNITIES FUND II, LLC     :
and AURELIUS CAPITAL MASTER, LTD.,      :      10 Civ. 1602 (TPG)
                                        :      10 Civ. 3507 (TPG)
                   Plaintiffs,          :      10 Civ. 3970 (TPG)
                                        :      10 Civ. 8339 (TPG)
              v.                        :
                                        :
THE REPUBLIC OF ARGENTINA,              :
                                        :
                   Defendant.           :
                                        :
----------------------------------------------------- x
                                        :
BLUE ANGEL CAPITAL I LLC,               :
                                        :      07 Civ. 2693 (TPG)
         Plaintiff,                     :      10 Civ. 4101 (TPG)
                                        :      10 Civ. 4782 (TPG)
v.                                      :
                                        :
THE REPUBLIC OF ARGENTINA,              :
                                        :
         Defendant.                     :
----------------------------------------------------- x
                                      . :
DIETER SCHECK AND LYDIA SCHECK,         :
                                        :
         Plaintiffs,                    :
                                        :      10 Civ. 5167 (TPG)
v.                                      :
                                        :
THE REPUBLIC OF ARGENTINA,              :
                                        :
         Defendant.                     :
                                        :
----------------------------------------------------- x
```

-2-

## DISCOVERY PERTAINING TO THE NML ACTIONS

WHEREAS, on August 14, 2012, plaintiff NML Capital, Ltd. ("NML") served on defendant the Republic of Argentina (the "Republic") "Plaintiff's Discovery Requests To Defendant The Republic Of Argentina" (the "NML Requests") seeking information relating to assets and potential alter egos of the Republic;

WHEREAS, NML served a "Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premises In A Civil Action" on each of Citibank, N.A., Deutsche Bank AG, HSBC Holdings PLC, HSBC Bank USA, N.A., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Standard Chartered PLC, Standard Chartered Bank, UBS AG, Wells Fargo & Co. and Wells Fargo Bank, N.A. on April 15, 2013, and on BNP Paribas and BNP Paribas Fortis on May 1, 2013 seeking information relating to assets of the Republic (the "NML Subpoenas");

WHEREAS, on May 28, 2013, the Republic moved to quash the NML Subpoenas (the "Republic's NML Motion");

WHEREAS, on June 27, 2013, NML moved to compel compliance with the NML Requests (the "NML Motion to Compel");

## DISCOVERY PERTAINING TO THE AURELIUS ACTIONS

WHEREAS, on December 13, 2011, plaintiffs Aurelius Capital Partners, LP, Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Opportunities Fund II, LLC, and Blue Angel Capital I LLC (collectively, the "Aurelius Plaintiffs") served "Plaintiffs' Requests For Production To Defendant" on the Republic seeking information regarding the Republic's assets (the "Aurelius Requests");

WHEREAS, the Aurelius Plaintiffs served on each of Banco de la Nación Argentina ("BNA"), Barclays Bank PLC and Barclays Capital, Inc. (together, "Barclays"), Citibank, N.A.,

-3-

Citicorp North America Inc., Citicorp USA Inc., Citigroup Global Markets Inc., and Citigroup Inc. (collectively, "Citibank"), Deutsche Bank AG, Deutsche Bank Americas Holding Corp., Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas, and Taunus Corporation (collectively, "Deutsche Bank") a "Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premises In A Civil Action" dated December 13, 2011;

WHEREAS, the Aurelius Plaintiffs served on each of Banc of America Securities LLC, Bank of America Corporation, Bank of America, N.A., Merrill Lynch & Co., Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporate (collectively, "Bank of America") a "Subpoena To Produce Documents, Information, Or Objects Or To Permit Inspection Of Premises In A Civil Action" dated January 12, 2012;

WHEREAS, the aforementioned subpoenas served by the Aurelius Plaintiffs are referred to herein, collectively and individually, as the "Aurelius Subpoenas";

WHEREAS, on October 10, 2012, the Aurelius Plaintiffs filed a motion to compel compliance with the Aurelius Requests and the Aurelius Subpoenas (the "Aurelius Motion To Compel");

WHEREAS, on November 7, 2012, Barclays and Citibank each filed motions to quash the Aurelius Subpoenas served on them (respectively, the "Barclays Motion" and the "Citibank Motion");

WHEREAS, on November 8, 2012, Deutsche Bank filed a motion to quash the Aurelius Subpoenas served on it (the "Deutsche Bank Motion");

WHEREAS, on December 3, 2012, Bank of America filed a motion to quash the Aurelius Subpoenas served on it (the "Bank of America Motion");

-4-

### DISCOVERY PERTAINING TO THE SCHECK ACTION

WHEREAS, on November 30, 2012, plaintiffs Dieter and Lydia Scheck (the "Schecks") served on the Republic a Restraining Notice and Information Subpoena seeking information relating to assets and potential alter egos of the Republic (the "Schecks' Restraining Notice and Information Subpoena");

WHEREAS, on December 10, 2012, the Republic filed a motion for a protective order and to quash the Schecks' Restraining Notice and Information Subpoena (the "Republic's Scheck Motion");

AND WHEREAS, at the hearing held on September 3, 2013, the Schecks moved to withdraw their application to extend the restraining notice contained in the Schecks' Restraining Notice and Information Subpoena;

For the reasons stated on the record at the hearing held on September 3, 2013, and for the purpose of preventing the Republic from evading its discovery obligations,

### IT IS HEREBY ORDERED THAT:

1.      The NML Motion to Compel is granted, and the Republic's NML Motion is denied, except that the Republic need not provide information regarding BNA in response to the alter ego sections of the NML Requests (i.e., section B. of the Interrogatories and section B. of the Document Requests).

2.      The Aurelius Motion to Compel is granted, and the Barclays Motion, the Citibank Motion, the Deutsche Bank Motion, and the Bank of America Motion are denied.

3.      The Republic's Scheck Motion is denied, and the Scheck's application to withdraw their application to extend the restraining notice contained in the Schecks' Restraining Notice and Information Subpoena is granted.

-5-

4.      The Republic shall produce all information responsive to the NML Requests (as limited by Paragraph 1 of this Order), the Aurelius Requests, and the Schecks' Restraining Notice and Information Subpoena[1] within 30 days of the date of this Order.

5.      BNA, Bank of America, Barclays, Citibank, and Deutsche Bank (as defined in the Aurelius Subpoenas, including but not limited to each of their respective branches, affiliates and subsidiaries) shall produce all information responsive to the Aurelius Subpoenas wherever in the world it may be located within 75 days of the date of this Order. The parties shall engage in discussions regarding a reasonable search methodology that BNA, Bank of America, Barclays, Citibank, and Deutsche Bank can use to reduce the burden of locating such information.

SO ORDERED.

Dated: New York, New York
        September 25, 2013

Thomas P. Griesa
United States District Judge

---

[1]     In construing the term "Judgment Debtor" in the Schecks' Restraining Notice and Information Subpoena, the Republic shall respond with respect to the entities identified as being part of the Republic in the NML Requests and the Aurelius Requests.

-6-

# EXHIBIT B

No.  _____

# In the Supreme Court of the United States

THE REPUBLIC OF ARGENTINA,

*Petitioner*,

v.

NML CAPITAL, LTD.,

*Respondent.*

*On Petition for Writ of Certiorari to the*
*United States Court of Appeals for the Second Circuit*

## PETITION FOR WRIT OF CERTIORARI

JONATHAN I. BLACKMAN
 *Counsel of Record*
CARMINE D. BOCCUZZI
DANIEL J. NORTHROP
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
jblackman@cgsh.com
cboccuzzi@cgsh.com
dnorthrop@cgsh.com

*Attorneys for Petitioner*
*The Republic of Argentina*

January 7, 2013

i

## QUESTION PRESENTED

Sections 1609 and 1610(a) of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 *et seq.*, limit execution on property of a foreign state to "property . . . in the United States . . . used for a commercial activity in the United States."

Whether post-judgment discovery in aid of enforcing a judgment against a foreign state can be ordered with respect to all assets of a foreign state regardless of their location or use, as held by the Second Circuit, or is limited to assets located in the United States that are potentially subject to execution under the FSIA, as held by the Seventh, Fifth, and Ninth Circuits.

ii

## LIST OF PARTIES

The petitioner in this case is the Republic of Argentina (Defendant-Appellant below).    The respondent is NML Capital, Ltd. (Plaintiff-Appellee below).[1]

---

[1] The caption of the underlying decision of the Second Circuit Court of Appeals incorrectly includes EM Ltd., Bank of America, and numerous Argentine entities.  The Republic informed the court of appeals of this error, but the caption was never amended.

iii

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . vi

OPINIONS BELOW . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY PROVISIONS INVOLVED . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . 2

      A. Background . . . . . . . . . . . . . . . . . . . . . . 2

      B. Respondent NML . . . . . . . . . . . . . . . . . 5

      C. The District Court Authorizes NML To
         Obtain Worldwide Discovery From
         Bank Of America And Banco De La
         Nación Argentina, And The Court of
         Appeals Affirms . . . . . . . . . . . . . . . . . . 9

REASONS FOR GRANTING THIS PETITION . . 14

   I.    THE SECOND CIRCUIT'S ERRONEOUS
        DECISION CONFLICTS WITH OTHER
        CIRCUITS ON WHETHER THE FSIA
        PLACES ANY LIMITATION ON POST-
        JUDGMENT ASSET DISCOVERY . . . . 14

iv

II.    THE      SECOND    CIRCUIT'S
ERRONEOUS DECISION CONFLICTS
WITH THIS COURT'S PRECEDENT
THAT   FEDERAL   STATUTES   ARE
P R E S U M E D    T O    A P P L Y
D O M E S T I C A L L Y ,     N O T
EXTRATERRITORIALLY  . . . . . . . . . . 22

III.    THE PETITION PRESENTS A PURELY
LEGAL DISPUTE ON A RECURRING
ISSUE OF CRITICAL IMPORTANCE TO
THE FOREIGN POLICY CONCERNS OF
THE UNITED STATES  . . . . . . . . . . . . . 26

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . 29

APPENDIX

Appendix A:    Opinion, United States Court of
Appeals for the Second Circuit
(August 20, 2012) . . . . . . . . . App. 1

Appendix B:    Opinion,  United  States District
Court, Southern District of New
York
(September 2, 2011) . . . . . . App. 21

Appendix C:    Hearing   Transcript Excerpts,
United  States  District  Court,
Southern District of New York
(August 30, 2011)  . . . . . . . App. 23

v

Appendix D:    Hearing   Transcript Excerpts,
United States District Court,
Southern District of New York
(December 17, 2010)  . . . . . App. 52

Appendix E:    Order, United States Court of
Appeals for the Second Circuit
(October 10, 2012)  . . . . . . . App. 87

Appendix F:    28 U.S.C. § 1604
28 U.S.C. § 1605(a)
28 U.S.C. § 1606
28 U.S.C. § 1609
28 U.S.C. § 1610(a)
28 U.S.C. § 1610(d)  . . . . . . App. 89

vi

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) . . . . . . . .  17, 24-25

*Af-Cap Inc. v. Republic of Congo*,
    462 F.3d 417 (5th Cir. 2006) . . . . . . . . . . . . . . 23

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) . . . . . . . . . . . . . . . . . . . . . 23

*Aurelius Capital Partners, LP v. Republic of Argentina*,
    584 F.3d 120 (2d Cir. 2009), *cert. denied*, 130 S.
    Ct. 1691 (2010) . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
    499 F.3d 737 (7th Cir. 2007) . . . . . . . . . . . . . . 25

*Conn. Bank of Commerce v. Republic of Congo*,
    309 F.3d 240 (5th Cir. 2002) . . .  12, 16-17, 23, 25

*EM Ltd. v. Republic of Argentina*,
    131 F. App'x 745 (2d Cir. 2005) . . . . . . . . . . . . . 7

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007), *cert. denied*, 522
    U.S. 818 (2007) . . . . . . . . . . . . . . . . . . . . . 7, 12, 16

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
    281 F.3d 48 (2d Cir. 2002) . . . . . . . . . . . . . . . . 17

vii

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
462 U.S. 611 (1983) . . . . . . . . . . . . . . 6-7, 14, 15

*H.W. Urban GmbH v. Republic of Argentina*,
No. 02 Civ. 5699 (TPG), 2003 WL 21058254
(S.D.N.Y. May 12, 2003) . . . . . . . . . . . . . . . . . . 4

*In re Motor Fuel Temperature Sales Practices Litig.*,
641 F.3d 470 (10th Cir. 2011), *cert. denied sub. nom, NATSO, Inc. v. 3 Girls Enters.,* 132 S. Ct.
1004 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Morrison v. Nat'l Austl. Bank Ltd.*,
130 S. Ct. 2869 (2010) . . . . . . . . . . . . . . . . . 22, 23

*NML Capital, Ltd. v. Banco Central De La República Argentina*,
652 F.3d 172 (2d Cir. 2011), *cert. denied sub. nom*, *EM Ltd. v. Republic of Argentina,* 133 S. Ct. 23 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*NML Capital, Ltd. v. Republic of Argentina*,
699 F.3d 246 (2d Cir. 2012) , *on remand*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012) (stayed by the Second Circuit on Nov. 28, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*NML Capital, Ltd. v. Republic of Argentina*,
No. 04-00197 (CKK), 2005 U.S. Dist. LEXIS 47027 (D.D.C. Aug. 3, 2005) . . . . . . . . . . . . . . . 7

*NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*,
788 F. Supp. 2d 1111 (C.D. Cal. 2011) . . . . . . . . 7

viii

*NML Capital, Ltd. v. Republic of Argentina*,
  695 F.3d 201 (2d Cir. 2012) . . . . . . . . . . . . *passim*

*Pravin Banker Assocs., Ltd. v. Banco Popular del
  Peru*,
  109 F.3d 850 (2d Cir. 1997) . . . . . . . . . . . . . . . . 4

*Rubin v. Islamic Republic of Iran*,
  133 S. Ct. 23 (2012) . . . . . . . . . . . . . . . . . . . . . . 22

*Rubin v. Islamic Republic of Iran*,
  637 F.3d 783 (7th Cir. 2011), *cert. denied*, 133 S.
  Ct. 23 (2012) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) . . . . . . . . . . . . . . . . . . . . . . 23

*Walters v. Indus. & Commercial Bank of China,
  Ltd.*,
  651 F.3d 280 (2d Cir. 2011) . . . . . . . . . . . . . . . . 17

## Rules and Statutes

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

28 U.S.C. § 1605 . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . 16, 23-24, 25

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . 16, 23-24, 25

28 U.S.C. § 1610(a) . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 69(a) . . . . . . . . . . . . . . . . . . . . . . . 24

ix

## Other Authorities

Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises* (2008), *available at* http://www.economics.harvard.edu/files/faculty /51_This_Time_Is_Different.pdf . . . . . . . . . . . . 3

Forrest McDonald, *Alexander Hamilton: A Biography* (1979) . . . . . . . . . . . . . . . . . . . . . . . . 4

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 . . . . . . . . . . . . . . . . . . . . 15, 24

Jonathan C. Lippert, Note, *Vulture Funds: The Reason Why Congolese Debt May Force a Revision of the Foreign Sovereign Immunities Act*, 21 N.Y. INT'L L. REV. 1 (2008) . . . . . . . . . . . 6

*NML Capital, Ltd. v. Republic of Argentina*, Cour d'appel [CA] [regional court of appeal] Paris, 4e pôle 8e ch., Dec. 9, 2010, No. 10/00390 (Fr.) (appeal pending to the Cour de Cassation [French Supreme Court]) . . . . . . . . . . . . . . . . . . . 8

*NML Capital, Ltd. v. Republic of Argentina*, Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Sept. 28, 2011, Bull. civ. I, No. 8 6 7 ( F r . ), *a v a i l a b l e a t* http://www.courdecassation.fr/jurisprudence_2/ premiere_chambre_civile_568/867_28_21103.h tml . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Order, *The "ARA Libertad Case" (Argentina v. Ghana)*, International Tribunal for the Law of the Seas (ITLOS) (Dec. 15, 2012), *available at* http://www.itlos.org/fileadmin/itlos/documents/cases/case_no.20/C20_Order_15_12_2012.pdf . . 8

Panel of Independent Advisers, *Economic and Financial Issues Facing Argentina*, Report to the Government of Argentina and the International Monetary Fund (July 29, 2002), *available at* http://www.imf.org/external/np/sec/nb/2002/nb0280.htm . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

Paul Blustein, *And the Money Kept Rolling In (and Out): Wall Street, the IMF, and the Bankrupting of Argentina* (2005) . . . . . . . . . . . . . . . . . . . . . . 3

Press Release, Office of the High Commissioner for Human Rights, *'Vulture Funds' – UN expert on foreign debt welcomes landmark law to address profiteering* (Apr. 20, 2010), *available at* http://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=9976&LangID=E . . . 6

Republic of Argentina, Annual Report (Form 18-K) (Sept. 30, 2011), *available at* http://www.sec.gov/Archives/edgar/data/914021/000090342311000486/roa-18k_0928.htm. . . . . . . . . . . . . . . . . . . . . 5

*Republic of Argentina v. NML Capital, Ltd.*, Cour de Cassation [Cass.] [Court of Cassation], Nov. 22, 2012, No. C.11.0688.F/1 (Belg.) . . . . . . . . . . . 8

xi

Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 INT'L LAW. 1189 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1

## PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

The Republic of Argentina (the "Republic") respectfully prays that this Court grant a writ of certiorari to the United States Court of Appeals for the Second Circuit.

### OPINIONS BELOW

The opinion of the court of appeals (Pet. App. A) is reported at 695 F.3d 201. The order of the district court compelling discovery (Pet. App. B) is not published.

### JURISDICTION

The judgment of the court of appeals was entered on August 20, 2012. A petition for rehearing *en banc* was denied on October 10, 2012 (Pet. App. E). The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

### STATUTORY PROVISIONS INVOLVED

The relevant statutory provisions, 28 U.S.C. §§ 1604, 1605(a), 1606, 1609, and 1610(a) and (d), are reprinted at Pet. App. F.

2

## STATEMENT OF THE CASE

This petition presents the important question, on which the courts of appeals are now divided, whether Rule 69(a) of the Federal Rules of Civil Procedure permits a United States court to order post-judgment discovery of property of a foreign state that could not be the subject of execution under the FSIA.

Section 1605 of the FSIA provides for subject matter jurisdiction to adjudicate claims *in personam* against a foreign state if one or more of the exceptions to sovereign immunity listed in that section, including waiver of immunity to jurisdiction, exists. Section 1610(a) provides for a considerably narrower scope of execution of a judgment on the property of a foreign state by limiting execution, even if there is a separate waiver of immunity to execution, to "property . . . in the United States . . . used for a commercial activity in the United States." The Second Circuit, disagreeing with the Seventh, Ninth, and Fifth Circuits, held that the existence of jurisdiction over a foreign state under Section 1605 is sufficient to permit post-judgment discovery in aid of execution on property that could not be the subject of execution under Section 1610(a).

### A. Background

Between 1998 and 2002, the Republic experienced the worst economic crisis of its modern history, marked by an enduring recession, fiscal imbalance, and lack of access to the international capital markets. *See* Decl. of Noemi C. LaGreca ¶¶ 4–13, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG) (S.D.N.Y. June 11, 2003); Decl. of Federico Carlos Molina ¶ 3, *NML*

3

*Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845 (TPG) (S.D.N.Y. Mar. 24, 2005); *see also* Paul Blustein, *And the Money Kept Rolling In (and Out): Wall Street, the IMF, and the Bankrupting of Argentina* 1 (2005) (describing collapse of Argentine economy in 2001 as "one of the most spectacular in modern history"). With its economy in ruins, the country suffered social and political turmoil: riots in the streets of Buenos Aires left dozens dead and four presidents resigned within a two-week period.[2] *See* Blustein, *supra*, at 1.

By the end of 2001, this crisis made it impossible for the Republic to service its overwhelming debt burden—some $80 billion in public external debt alone—while maintaining basic governmental services necessary for the health, welfare, and safety of the Argentine populace. "[U]nable to service its debts," the Republic had no choice but to defer interest and principal payments to its bondholders. *See* Panel of

---

[2] The Argentine crisis has been described as the "worst-case scenario" in eight centuries of modern financial crises. *See* Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises*, at 51 (2008), *available at* http://www.economics.harvard. edu/files/faculty/51_This_Time_Is_Different.pdf; *see also* Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 INT'L LAW. 1189, 1196 (2009) (describing Argentina's economic crisis: "The living standards of over one-half of the Argentine people fell below the poverty line, and over a third could not afford basic food. Children were fainting in class from hunger, regularly. Adults were rioting and breaking into supermarkets, regularly, in search of food. UNICEF Argentina was concerned that stunted growth and reduced mental capacities would be the long-term consequence of this economic crisis for millions of the nation's children.").

4

Independent Advisers, *Economic and Financial Issues Facing Argentina*, Report to the Government of Argentina and the International Monetary Fund, ¶ 1 (July 29, 2002), *available at* http://www.imf.org/external/np/sec/nb/2002/nb0280.htm. Like many nations that have faced economic crisis and unsustainable indebtedness, including the United States in the early days of the Constitution, *see generally* Forrest McDonald, *Alexander Hamilton: A Biography* 163–88 (1979), the Republic was forced to seek restructuring of both its external and internal public debt.[3]

Because there is no bankruptcy regime for insolvent states, the Republic restructured its external debt on an entirely voluntary basis. The Republic did not repudiate that debt. Instead, consistent with United States policy favoring the orderly and consensual restructuring of sovereign debt, the Republic

---

[3] The United States, the international financial community, and the federal courts have all recognized the importance of voluntary sovereign debt restructuring. *See, e.g.*, Brief for the United States as *Amicus Curiae* in Support of Reversal, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105-cv(L), 2012 WL 1150791, at *6–10 (2d Cir. Apr. 4, 2012); Statement of Interest of the United States, *Macrotecnic Int'l Corp. v. Republic of Argentina*, No. 02 Civ. 5932 (TPG), 2004 WL 5475206, at *2–6 (S.D.N.Y. Jan. 12, 2004); *H.W. Urban GmbH v. Republic of Argentina*, No. 02 Civ. 5699 (TPG), 2003 WL 21058254, at *2 (S.D.N.Y. May 12, 2003) ("[A]n important channel for attempting to resolve the Argentine debt problem will undoubtedly be the effort to negotiate a debt restructuring plan."); *cf. Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 855 (2d Cir. 1997) ("[T]he United States encourages participation in, and advocates the success of, IMF foreign debt resolution procedures . . .").

5

restructured its unsustainable debt burden through two global exchange offers in 2005 and 2010, in which participating holders exchanged old, nonperforming bond interests for new, performing bond interests with lower interest rates, reduced principal, and/or longer maturities. The exchange offers were extended to all beneficial owners of eligible bonds—including respondent NML Capital, Ltd. ("NML")—on the same terms, and reflected the Republic's commitment to treat its private creditors equitably. Owners tendered over 91% of the aggregate eligible debt in the exchange offers (a supermajority that would be more than sufficient to "cram down" respondent and other "holdouts" under most bankruptcy regimes), making the Republic's sovereign debt restructuring the largest in history at that time. *See* Republic of Argentina, Annual Report (Form 18-K), at 17 (Sept. 30, 2011), *available at* http://www.sec.gov/Archives/edgar/data/914021/000090342311000486/roa-18k_0928.htm. NML declined to participate in either restructuring.

## B. Respondent NML

Plaintiff-Respondent NML is a Cayman Islands hedge fund, established exclusively to buy distressed Republic debt, that acquired beneficial interests in Republic bonds at a deep discount both immediately before, and well after, the Republic suspended payments on its unsustainable external debt in December 2001. NML and similar "vulture" hedge funds seek to take advantage of the absence of bankruptcy protection in the sovereign context by bringing lawsuits for the face value of defaulted sovereign debt, obtaining judgments on which interest

6

continues to run indefinitely, and then using aggressive means to try to execute them.[4]

NML has used these aggressive tactics against the Republic, while at the same time continuing to speculate in nonperforming Republic debt, filing a new complaint against the Republic as recently as 2009 on more than $100 million of defaulted Republic bond interests that it purchased in late 2008. *See NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 1708 (TPG) (S.D.N.Y. compl. filed Feb. 24, 2009). NML's enforcement tactics include a series of execution attempts against property of the Republic and other entities[5] that the federal courts have in most cases

---

[4] *See, e.g.*, Press Release, Office of the High Commissioner for Human Rights, *'Vulture Funds' – UN expert on foreign debt welcomes landmark law to address profiteering* (Apr. 20, 2010), *available at* http://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=9976&LangID=E (last visited Jan. 7, 2013) ("[T]he profiteering of 'vulture funds' [has been] at the expense of both the citizens of distressed debtor countries and the taxpayers of countries that have supported international debt relief efforts. . . . 'Vulture funds' have exploited the voluntary nature of international debt relief schemes by acquiring defaulted sovereign debt at deeply discounted prices and then seeking repayment of the full value of the debt through litigation, seizure of assets or political pressure.") (internal quotation marks omitted); Jonathan C. Lippert, Note, *Vulture Funds: The Reason Why Congolese Debt May Force a Revision of the Foreign Sovereign Immunities Act*, 21 N.Y. INT'L L. REV. 1, 2, 27 (2008) (vulture funds seek "extraordinary profits at the expense of U.S. companies, the U.S. economy and U.S. foreign relations . . . potentially affecting debt restructuring in all emerging markets").

[5] These entities are presumptively separate from the Republic and therefore presumptively immune from execution on Republic debt.

7

rejected as violating the FSIA,[6] and an attempt in March 2005 to disrupt the settlement of the Republic's global exchange offer by attaching—on an *ex parte* basis—the nonperforming bonds tendered by their beneficial owners into that exchange. *See EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (affirming vacatur of this attachment). They also include—of particular interest here—similar unsuccessful efforts to enforce its United States

---

*See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983) ("*Bancec*") ("Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.") (citation and footnote omitted).

[6] *See, e.g.*, *NML Capital, Ltd. v. Banco Central De La República Argentina*, 652 F.3d 172, 196–97 (2d Cir. 2011) (rejecting NML's attempt to attach property of the central bank of Argentina), *cert. denied sub. nom*, *EM Ltd. v. Republic of Argentina*, 133 S. Ct. 23 (2012); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 124, 130–31 (2d Cir. 2009) (rejecting attempt by NML and others to execute upon Argentine social security funds because the Republic had not "used [the funds] for a commercial activity in the United States"), *cert. denied*, 130 S. Ct. 1691 (2010); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 465–66 (2d Cir. 2007) (rejecting NML's attempt to attach property of the central bank of Argentina), *cert. denied*, 522 U.S. 818 (2007); *NML Capital, Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1127 (C.D. Cal. 2011) (rejecting NML's attempt to execute on satellite jointly launched by Argentine space agency, NASA, and other nations' space agencies); *NML Capital, Ltd. v. Republic of Argentina*, No. 04-00197 (CKK), 2005 U.S. Dist. LEXIS 47027 (D.D.C. Aug. 3, 2005) (vacating NML's *ex parte* attachments of diplomatic and military property in Washington, D.C., and Maryland).

8

judgments outside the United States, ranging from an attempt to attach taxes owed to the Republic in France,[7] to attempts to attach diplomatic bank accounts in France[8] and Belgium,[9] to the attempted seizure of an Argentine naval vessel in Ghana,[10] in each case without any claim by NML that it needed discovery from a United States court to pursue these legally improper execution efforts.[11]

---

[7] *See NML Capital, Ltd. v. Republic of Argentina*, Cour d'appel [CA] [regional court of appeal] Paris, 4e pôle 8e ch., Dec. 9, 2010, No. 10/00390 (Fr.) (appeal pending to the Cour de Cassation [French Supreme Court]).

[8] *See NML Capital, Ltd. v. Republic of Argentina*, Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Sept. 28, 2011, Bull. civ. I, No. 867 (Fr.), *available at* http://www.courdecassation. fr/jurisprudence_2/ premiere_chambre_civile_568/867_28_21103.html.

[9] *See Republic of Argentina v. NML Capital, Ltd.*, Cour de Cassation [Cass.] [Court of Cassation], Nov. 22, 2012, No. C.11.0688.F/1 (Belg.).

[10] Order, *The "ARA Libertad Case" (Argentina v. Ghana)*, International Tribunal for the Law of the Seas (ITLOS) (Dec. 15, 2012), *available at* http://www.itlos.org/fileadmin/itlos/documents/ cases/case_no.20/C20_Order_15_12_2012.pdf.

[11] Most recently, NML has sought to enjoin the Republic from paying any interest on its restructured debt unless it also pays 100% of NML's defaulted debt, an issue that is now before the Second Circuit after that court initially upheld NML's claim to injunctive relief but remanded to the district court for clarification of key aspects of the scope of the injunction. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 265 (2d Cir. 2012), *on remand*, No. 08 Civ. 6978 (TPG), 2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012) (stayed by the Second Circuit on Nov. 28, 2012).

9

### C. The District Court Authorizes NML To Obtain Worldwide Discovery From Bank Of America And Banco De La Nación Argentina, And The Court of Appeals Affirms

In 2010, NML embarked on an unprecedented discovery campaign aimed at information pertaining to what it characterized as the Republic's international "financial circulatory system." *See NML Capital v. Republic of Argentina*, 695 F.3d 201, 203 (2d Cir. 2012) (Pet. App. A at 5); *see also* Hr'g Tr. at 10, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 17, 2010) ("Dec. 17 Hr'g Tr.") (Pet. App. D at 60). As part of this effort, NML served subpoenas on Bank of America and Banco de la Nación Argentina ("BNA") on March 10, 2010, and June 14, 2010, respectively. The subpoenas sought expansive information regarding not only the Republic's assets, but also those of hundreds of Argentine public officials from the Republic's President and deceased former President on down, and separate entities (both state-owned and private), with no attempt in any instance to limit the requests to property even arguably used for a commercial activity in the United States.[12] To the

---

[12] Plaintiff's subpoena served on Bank of America defines the Republic as including 136 public officials, 43 independent entities, and 148 purported "Ministries" and "Secretariats" of the Republic, as well as countless "agencies, ministries, instrumentalities, political subdivisions, employees, attorneys, representatives, affiliates, subsidiaries, predecessors, successors, alter-egos, and assigns." *See* NML Notice of Subpoena served on Bank of America, N.A., dated Mar. 10, 2010, *NML Capital, Ltd. v. Republic of Argentina*, No. 11-5065-cv(L), Joint Appendix Volume III, A-

10

contrary, NML made it clear that it intended the discovery requests to cover *all* property of the Republic and the hundreds of other parties and entities named in the subpoena, including property located outside the United States and property not used for a commercial activity.

The Republic moved to quash the Bank of America subpoena on May 17, 2010, and Bank of America joined.  NML later moved to compel BNA and Bank of America to comply with the subpoenas, which the Republic and both banks opposed.  Among other things, the Republic argued that because execution on property of a foreign state under the FSIA is limited to "property in the United States of a foreign state . . . used for a commercial activity in the United States," 28 U.S.C. § 1610(a) (Pet. App. F at 92), discovery of property *outside* the United States, and therefore by definition not subject to execution under the statute, is neither

---

662–80 (2d Cir. Nov. 15, 2011).  It demanded, *inter alia*, documents concerning "[e]ach asset or property of any kind whatsoever which Argentina owned directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially."  *Id.* at A-673.  The subpoena NML served on BNA was equally expansive, defining the Republic to include 225 entities, including all "agencies, instrumentalities, ministries, political subdivisions, representatives, [and] State Controlled Entities," and demanding documents concerning "any property, assets or accounts maintained at BNA *anywhere* in the name of Argentina or for Argentina's benefit."  *See* NML Notice of Subpoena served on Banco de la Nación Argentina, dated June 14, 2010, *NML Capital Ltd.*, Joint Appendix Volume IV, A-900–09 (2d Cir. Nov. 15, 2011) (emphasis added); Attachment to letter from Joshua I. Sherman to Mark S. Sullivan, dated July 20, 2010, *NML Capital Ltd.*, Joint Appendix Volume VIII, A-1599–1606 (2d Cir. Nov. 15, 2011).

11

permissible under the FSIA nor relevant as a matter of law to execution under it.

After initially noting the unprecedented nature of NML's extraterritorial asset discovery request at a hearing on December 17, 2010, *see* Dec. 17 Hr'g Tr. at 17 (Pet. App. D at 66) ("I really think that now the discovery is taking a shape that it has not taken before, . . . you are seeking information about assets located in foreign countries"), the district court concluded at a second hearing that it could serve as "a clearinghouse for information . . . that might lead to attachments or executions *anywhere in the world*." Hr'g Tr. at 30, *NML Capital, Ltd. v. Republic of Argentina*, No. 03 Civ. 8845 (TPG) ("Aug. 30 Hr'g Tr.") (S.D.N.Y. Aug. 30, 2011) (Pet. App. C at 31) (emphasis added). It orally granted NML's motions to compel and denied the Republic's, BNA's, and Bank of America's objections to the subpoenas as well as the motion to quash, confirming the ruling by written Order on September 2, 2011 (the "Extraterritorial Asset Discovery Order") (Pet. App. B).

The Republic appealed the district court's decision to the Second Circuit, contending that the Extraterritorial Asset Discovery Order violated the FSIA by permitting discovery on assets: 1) located outside the United States; 2) not used for a commercial activity in the United States; and 3) belonging to entities and officials that are not the Republic. NML responded that the FSIA places no limitation on discovery in aid of judgment enforcement, and that the FSIA is irrelevant because the discovery was propounded to third-party banks.

12

By decision dated August 20, 2012, the Second Circuit Court of Appeals adopted these arguments and affirmed the Extraterritorial Asset Discovery Order.[13] It specifically held that the FSIA does not limit post-judgment discovery on assets of a foreign state in aid of execution of a United States court's judgment, and that the FSIA's limits on execution had no bearing on the scope of such discovery. *See NML Capital*, 695 F.3d at 209 (Pet. App. A at 16) ("Whether a particular sovereign asset is immune from attachment must be determined separately under the FSIA, but this determination does not affect discovery."). Instead, as to post-judgment discovery in aid of execution, the Second Circuit held that "[o]nce the district court had

---

[13] NML also argued that the Republic had waived its immunity from post-judgment discovery in the Fiscal Agency Agreement governing the bonds. The Second Circuit did not discuss this point, no doubt because NML had never raised it in the district court (and therefore forfeited the argument), and because the Second Circuit, like every other court to consider the issue, had previously held that despite a waiver of immunity, a court's power is still limited to what the FSIA permits. *See EM Ltd. v. Republic of Argentina*, 473 F.3d at 481 n.19 (Republic's waiver extends "only to the 'extent permitted under the laws of the jurisdiction.' . . . Under the laws of this jurisdiction, courts may grant the remedies of attachment, arrest and execution against a foreign state's property only if the property is eligible for attachment under a specific provision of the FSIA.") (citing *Conn. Bank of Commerce v. Republic of Congo*, 309 F.2d 240, 247 (5th Cir. 2002) ("If a foreign sovereign waives its immunity from execution, U.S. courts may execute against property in the United States . . . used for a commercial activity in the United States. . . . Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria.") (internal quotation marks omitted)); *Aurelius Capital Partners*, 584 F.3d at 129–30 (*Id.*).

13

subject matter and personal jurisdiction over Argentina, it could exercise its judicial power over Argentina as over *any other party*," and that "the banks' compliance with the subpoenas will cause Argentina *no burden* and *no expense*." *Id.* at 209–10 (Pet. App. A at 18–19) (emphasis added).[14] In reaching this conclusion, the Second Circuit expressly rejected the opinion of the Seventh Circuit in *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011), *cert. denied*, 133 S. Ct. 23 (2012), *see NML Capital*, 695 F.3d at 209 (Pet. App. A at 18), which had held that "general-asset discovery" of a foreign state's property violates the FSIA, *see Rubin*, 637 F.3d at 799, and it disregarded the views of the United States, which has consistently supported the Seventh Circuit's position, *see* Brief for the United States of America as *Amicus Curiae*, *Rubin v. Islamic Republic of Iran*, No. 11-431, 2012 WL 1891593 (May 25, 2012) (hereinafter "U.S. *Rubin* Certiorari *Amicus*"); Brief for the United States as *Amicus Curiae* Supporting Reversal, *Rubin v. Islamic Republic of Iran*, No. 08-2805, 2009 WL 8132813 (7th Cir. June 26, 2009) (hereinafter "U.S. *Rubin* 7th Cir. *Amicus*").

---

[14] The one limitation the Second Circuit saw as applicable, which was not based on the FSIA, but is simply a general principle of discovery, was the court's authority to order discovery in a "prudential and proportionate way." *NML Capital*, 695 F.3d at 207 (Pet. App. A at 14). That limitation appears itself illusory, as under no definition of those terms could worldwide discovery of hundreds of entities be in any way deemed "prudential and proportionate."

14

## REASONS FOR GRANTING THE PETITION

The Court should grant certiorari because the Second Circuit's decision directly conflicts with decisions of other circuits, this Court's longstanding precedent, and the expressed interests and views of the United States Government, all of which oppose the Second Circuit's holding that the FSIA imposes no limit on a United States court's authority to order blanket post-judgment execution discovery on the assets of a foreign state used for any activity anywhere in the world. The Second Circuit's decision has created a clear conflict among the courts of appeals on the interpretation of the FSIA, a statute expressly enacted to provide uniformity in the treatment of foreign sovereigns in United States courts. The decision also disregards this Court's recent precedent on giving effect to Congress's determination of the geographic scope of federal statutes and imperils the foreign relations of the United States and its own rights as a litigant abroad.

## I.    THE SECOND CIRCUIT'S ERRONEOUS DECISION CONFLICTS WITH OTHER CIRCUITS ON WHETHER THE FSIA PLACES ANY LIMITATION ON POST-JUDGMENT ASSET DISCOVERY

Congress enacted the FSIA in 1976 with the express purpose of providing a uniform body of law to govern the sovereign immunity of foreign states in United States courts. *See, e.g.*, *Bancec*, 462 U.S. at 622 n.11 ("When it enacted the FSIA, Congress expressly acknowledged the importance of developing a uniform body of law concerning the amenability of a foreign

15

sovereign to suit in United States courts." (internal
quotation marks omitted)); H.R. Rep. No. 94-1487, at
13, 32 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604,
6611, 6631, 6632 (noting Congress's intent to promote
a "uniformity in decision" in "cases involving foreign
sovereigns" and Congress's concerns about "the
potential sensitivity of actions against foreign states
and the importance of developing a uniform body of law
in this area").  The holding of the Second Circuit that
the FSIA places no limitation on post-judgment
discovery concerning assets of a foreign state
undermines this uniformity and directly contradicts
decisions of the Seventh, Fifth, and Ninth Circuits.
This Court's review is therefore warranted.

The Seventh Circuit's decision in *Rubin*, 637 F.3d
783, represents the weight of authority on the
application of the FSIA to post-judgment asset
discovery.  There, the Seventh Circuit reversed a
district court order permitting "general-asset
discovery" of all Iranian property located in the United
States.  *See id.* at 799.  The Seventh Circuit noted that
Rule 69(a), which governs all post-execution
proceedings, including discovery in aid of execution,
specifically states that "a federal statute governs to the
extent it applies." *Id.* at 794–95 (citing Fed. R. Civ. P.
69(a)(1)).  It therefore held that, "the FSIA plainly
applies and limits the discovery process" when a party
seeks discovery of a foreign state's assets in aid of
judgment enforcement.  *Id.* at 795.

In reaching this conclusion, the Seventh Circuit
explicitly rejected the Second Circuit's reliance on the
existence of jurisdiction over the foreign state judgment
debtor as the basis for subjecting it and its property to

16

general discovery under Rule 69. The Seventh Circuit emphasized the distinction between immunity from suit, *see* 28 U.S.C. §§ 1604–1605 (Pet. App. F at 89–91), and immunity from attachment and execution, *see* 28 U.S.C. §§ 1609–1610 (Pet. App. F at 92–94), noting the indisputable fact that the exceptions to immunity from attachment and execution are considerably narrower than the exceptions to jurisdictional immunity, *see Rubin*, 637 F.3d at 796–97. The Seventh Circuit reasoned that although a United States court may have subject matter jurisdiction over a foreign state for the purpose of adjudging its liability, executing on a foreign state's assets raises distinct immunity considerations. *Id.* at 797. Because one of the purposes of sovereign immunity is to "shield foreign states" from "unwarranted litigation costs and intrusive inquiries," *id.* at 796–97, the court concluded that prior to obtaining discovery of a foreign state's property, a plaintiff "must identify the specific property that is subject to attachment and plausibly allege that an exception to 1609 attachment immunity applies," *id.* at 799.

The Seventh Circuit agreed with decisions of the Fifth and Ninth Circuits (as well as the clear implication of an earlier decision from the Second Circuit itself), all of which stated that post-judgment discovery concerning property of a foreign state should be ordered "circumspectly and only to verify allegations of specific facts crucial to the immunity determination," which means, in the post-judgment context, immunity from attachment or execution. *See id.* at 796 (quoting, *e.g.*, *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007); *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260 n.10 (5th Cir.

17

2002) (instructing district court as to proper scope of
discovery on remand); *Af-Cap, Inc. v. Chevron Overseas
(Congo) Ltd.*, 475 F.3d 1080, 1095-96 (9th Cir. 2007));
*see also Walters v. Indus. & Commercial Bank of
China, Ltd.*, 651 F.3d 280, 297 (2d Cir. 2011) (holding
that execution must be limited to specifically identified
property within the United States that falls within an
exception to immunity under Section 1610; "Insofar as
petitioners complain that the Banks successfully moved
to quash subpoenas *duces tecum* in prior proceedings in
the Southern District of New York, petitioners there
sought information pertaining to China's assets *outside*
the United States, which were held categorically
immune from execution under the FSIA." (emphasis in
original)); *cf. First City, Texas-Houston, N.A. v.
Rafidain Bank*, 281 F.3d 48, 53 (2d Cir. 2002) (FSIA
jurisdiction based on commercial activity in the United
States continues post-judgment to include discovery of
the foreign state judgment debtor's assets; "Rafidain,
having participated in commercial banking
transactions in the United States, submitted itself to
the jurisdiction of the United States courts, as well as
to the procedures and legal responsibilities associated
with such jurisdiction, *to the extent those procedures
and responsibilities are related to its commercial
activities in the United States*." (emphasis added)).

Despite this pervasive authority, the Second Circuit
reached the sweeping and remarkable conclusion that
the FSIA places *no* limitation on a party's ability to
seek post-judgment discovery concerning the assets of
a foreign state located *anywhere* in the world.  *See
NML Capital*, 695 F.3d at 609 (Pet. App. A at 16).  The
Second Circuit recognized that its holding ran directly
contrary to that of the Seventh Circuit in *Rubin*, but

18

nonetheless "respectfully disagree[d]" with that holding, concluding that discovery does not implicate a foreign state's immunity from execution or attachment because discovery does not itself attach a sovereign's property. *See id.* at 208–09 (Pet. App. A at 15–17). The Second Circuit thus found that the FSIA's limits on execution were irrelevant to discovery that has the sole purpose of aiding in that very execution, holding that it was enough that a district court has "subject matter and personal jurisdiction" over a foreign state. *See id.* at 209 (Pet. App. A at 18). This reductionist argument, which conflated the broader scope of jurisdiction under Section 1605 of the FSIA with the narrower scope of attachment and execution-related remedies under Section 1610, was specifically rejected by the Seventh Circuit. *See Rubin*, 637 F.3d at 797 (noting critical error in plaintiffs' contention that once a "court has exercised jurisdiction over a foreign sovereign and entered a judgment against it," a plaintiff is entitled "to the same broad discovery as any other litigant seeking to execute on a judgment under Rule 69(a)").

The Second Circuit also held that the FSIA has no application in the instant case because plaintiff served its expansive discovery requests on third-party banks rather than the Republic itself. *See NML Capital*, 695 F.3d at 210 (Pet. App. A at 19). Although the subpoenas seek detailed account information *of* the Republic, hundreds of its agencies or instrumentalities, and hundreds of its officials (including its current and deceased former president), *see id.* at 204 (Pet. App. A at 6), the Second Circuit viewed only the banks as the affected parties, and concluded that "the banks' compliance with the subpoenas will cause Argentina *no* burden and *no* expense," *id.* at 210 (Pet. App. A at 19)

19

(emphasis added).  This holding also conflicts with the Seventh Circuit's reasoning in *Rubin*.

In *Rubin*, the Seventh Circuit properly recognized that even when execution immunity is not raised by the state itself (there, although discovery was served on the state judgment debtor Iran, the original claim of execution immunity was raised by private persons holding Iranian property), the court must nonetheless address it, because, "[t]he immunity inheres in the property itself."  637 F.3d at 799.  The same logic applies to post-judgment discovery in aid of execution on that property.  It is the sovereign nature of the property and its use that gives rise to the immunity in each instance, not who raises the immunity claim.

Unlike the Second Circuit, the Seventh Circuit recognized in *Rubin* the "burdens of litigation" from which sovereign immunity is intended to shield a foreign state, including the "cost and aggravation of discovery," as well as the "intrusive inquiries" that result from sweeping discovery requests like the ones present here.  *Rubin*, 637 F.3d at 795, 796–97.  One would be hard pressed to find a more intrusive inquiry than a "forensic examination" of the financial affairs of a foreign state's current and late president, as well as the state itself and hundreds of its separate agencies or instrumentalities.  The Second Circuit's refusal to acknowledge that discovery of immune property burdens parties beyond those actually served with it is irreconcilable with the rationale set forth by the Seventh Circuit.  Not only will discovery of this kind inevitably spill over into equally intrusive discovery of the party itself, but common sense suggests that when third parties are forced to submit to costly discovery

20

devices because they have done business with, and
therefore have information regarding, a state, those
costs will be passed on to the state in one form or
another.

The Seventh Circuit's conclusion that discovery in
aid of execution must be limited to property of the
foreign state used for a commercial activity in the
United States, because only property fitting that
definition falls within the enforcement jurisdiction of
United States courts under Section 1610 of the FSIA,
*id.* at 794 (holding general asset discovery
"incompatible with the text, structure, and history of
the FSIA"); *id* at 799, applies equally to discovery
served on a foreign state and discovery served on a
third party concerning that foreign state's assets. In
either case, the discovery is sought for the purpose of
executing on the sovereign's property. It cannot be
seriously argued, for instance, that discovery about a
state's diplomatic bank accounts or military property
served on a non-party bank or military contractor
would not be just as intrusive and detrimental to
sovereign immunity principles as such discovery served
on the state itself. But the Second Circuit's ruling
treats the former as raising no issue under the FSIA.[15]

---

[15] The Second Circuit suggested that such concerns might be
addressed as a matter of "privilege" and not sovereign immunity.
*See NML Capital, Ltd. v. Republic of Argentina*, 695 F.3d 201, 210
(2d Cir. 2012)(Pet. App. A at 19–20). But it did not articulate what
"privilege" would apply or why a privilege claim regarding
discovery directed to a third party would not face the usual
difficulties that exist when the holder of a privilege tries to assert
it over a third party's documents. *See, e.g.*, *In re Motor Fuel
Temperature Sales Practices Litig.*, 641 F.3d 470, 484–86 (10th Cir.

21

On this point too, the Second Circuit's false distinction between permitting discovery from a foreign state itself and permitting that same discovery from a third party conflicts with the reasoning and result in *Rubin*.

It is noteworthy that NML and its attorneys have themselves argued to this Court that *Rubin* directly conflicts with Second Circuit precedent on whether the FSIA limits discovery into the assets of a foreign state, and that this circuit split requires this Court's review. After the Seventh Circuit's decision, plaintiffs in *Rubin* petitioned this Court for certiorari, and NML's counsel represented petitioners as counsel of record before the Court, undoubtedly because of NML's interest in the same issue that was then pending before the Second Circuit in the instant case. Petitioners contended, *inter alia*, that the Seventh Circuit's decision in *Rubin* "undermines th[e] congressionally prescribed uniformity" in the treatment of sovereign nations in United States courts, and that "[t]his Court's review is warranted to resolve this circuit split and provide much-needed guidance regarding the scope of discovery available to judgment creditors under the FSIA." Petition for Writ of Certiorari, *Rubin v. Islamic Republic of Iran*, No. 11-431, 2011 WL 4642674, at *10, *16 (Oct. 6, 2011). NML and other vulture funds then

---

2011) (declining to extend the doctrine of *Perlman v. United States*, 247 U.S. 7 (1918), which allows appeal by holder of attorney-client privilege from order compelling production of documents by third party in criminal grand jury proceedings, as "[t]he underpinnings of the *Perlman* rule . . . simply do not apply with equal force to a subpoena directed at a non-party as part of discovery in civil litigation"), *cert. denied sub. nom*, *NATSO, Inc. v. 3 Girls Enters.*, 132 S. Ct. 1004 (2012).

22

submitted a brief as *amicus curiae* in support of petitioners, "agree[ing] with petitioners that review is warranted to resolve this Circuit conflict." Brief of NML Captial, Ltd., *et al.*, as *Amici Curiae* in Support of Petitioners, *Rubin v. Islamic Republic of Iran*, No. 11-431, 2011 WL 5402978, at *4 (Nov. 7, 2011). At the time, NML's position was seriously overstated, because the Second Circuit had then *not* disagreed with *Rubin* and its prior precedent did not furnish a different reading of the FSIA, and this Court denied the petition. *See Rubin v. Islamic Republic of Iran*, 133 S. Ct. 23 (2012). Now, the circuit split that NML claimed indeed does exist, and this Court's review is therefore warranted, just as NML itself urged (albeit then prematurely) in its *Rubin* petition.

## II. THE SECOND CIRCUIT'S ERRONEOUS DECISION CONFLICTS WITH THIS COURT'S PRECEDENT THAT FEDERAL STATUTES ARE PRESUMED TO APPLY D O M E S T I C A L L Y , N O T EXTRATERRITORIALLY

Besides the direct circuit split, the Extraterritorial Asset Discovery Order is also at odds with this Court's decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010), which reaffirmed "the longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 2877 (internal quotation marks omitted). The Court in *Morrison* considered and rejected the Second Circuit's extraterritorial application of Section 10(b) of the Securities and Exchange Act of 1934, reasoning that irrespective of

23

Congress's power to exercise its prescriptive jurisdiction and regulate entities abroad that engage in conduct that might affect the United States, "Congress ordinarily legislates with respect to domestic, not foreign matters." *Id.* at 2877–78. Accordingly, the Court held that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878.

The same reasoning applies with greater force to the FSIA, a jurisdictional statute. "[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). It also "provides the sole, comprehensive scheme for enforcing judgments against foreign sovereigns." *Af-Cap Inc. v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493, 496 (1983) ("The statute must be applied by the District Courts in every action against a foreign sovereign," and "[a]s the House Report clearly indicates, the primary purpose of the Act was to 'set forth comprehensive rules governing sovereign immunity'" (quoting H.R. Rep. No. 94-1487, at 12 (1976))); *Conn. Bank*, 309 F.3d at 252 (noting that prior to enactment of the FSIA, foreign sovereigns enjoyed absolute immunity from execution against their property). Under the FSIA, a federal court may exercise jurisdiction over a sovereign to adjudge its liability only if a statutory exception to immunity from suit applies, *see* 28 U.S.C. §§ 1604–1605 (Pet. App. F at 89–91), and it may provide post-judgment execution remedies to a judgment creditor only if a statutory exception to immunity from execution applies, *see* 28 U.S.C. §§ 1609–1610 (Pet. App. F at 92–94). Discovery

24

in aid of execution squarely falls within the category of post-judgment execution remedies. *See* Fed. R. Civ. P. 69(a); H.R. Rep. No. 94-1487, at 28 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627 ("The term 'attachment in aid of execution' [in § 1610(a)] is intended to include attachments, garnishments, and *supplemental proceedings* available under applicable Federal or State law to obtain satisfaction of a judgment. *See* Rule 69, Fed. R. Civ. P.") (emphasis added); *accord* Brief of the United States as *Amicus Curiae* in Support of Appellant, *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, No. 10-7046, 2010 WL 4569107, at *27–28 (D.C. Cir. Oct. 7, 2010) (hereinafter "U.S. *FG Hemisphere Amicus*"). Indeed, the Second Circuit itself acknowledged that the district court's authority to issue the Extraterritorial Asset Discovery Order derived "from its power to conduct *supplementary proceedings*." *See NML Capital*, 695 F.3d at 208 (Pet. App. A at 16) (emphasis added).

Accordingly, where a state's liability has already been determined and a judgment creditor is seeking to enforce its judgment, as is the case here, a court's authority to order discovery in aid of execution is circumscribed by Section 1610. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 795 (7th Cir. 2011) ("Discovery requests in aid of execution may be made pursuant to either the federal rules or the corresponding rules of the forum state, but either way, the FSIA plainly applies and limits the discovery process.") (citation omitted); *Af-Cap*, 475 F.3d at 1096 (discovery in aid of execution should be ordered "circumspectly and only to verify allegations of specific facts crucial to the immunity determination") (internal quotation marks omitted); *Conn. Bank of Commerce*,

25

309 F.3d 240, 260 n.10 (5th Cir. 2002) (*Id.*). The power of United States courts to order post-judgment asset discovery is not a freestanding one, but derives from and is necessarily limited by the underlying power to order execution on such assets as Congress permits. That power is clearly limited to property in the United States. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world. We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.").

*Morrison* makes clear that such a "hint" of extraterritorial application must be expressed by Congress in the language of the relevant statute, not implied by a court because it thinks it is a good idea in a specific case. Here, the language of the statute could not be clearer that Congress did *not* intend extraterritorial application. Section 1609 of the FSIA states that "the property *in the United States* of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611," and Section 1610 states that "property *in the United States* of a foreign state . . . used for a commercial activity *in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States" if one or more of the listed exceptions in Section 1610(a)(1)–(7) are satisfied. *See* 28 U.S.C. §§ 1609–1610 (Pet. App. F at 92–94) (emphasis added). Congress did not intend extraterritorial application

26

when it made these specific references to "the United States" and to nowhere else.

Ignoring the statutory limitation, the district court issued the Extraterritorial Asset Discovery Order, declaring that it would serve as "a clearinghouse for information . . . that might lead to attachments or executions *anywhere in the world*," Aug. 30 Hr'g Tr. at 29-30 (Pet. App. at 31) (emphasis added), and the Second Circuit affirmed its authority to do so. The Extraterritorial Asset Discovery Order thus conflicts with this Court's extraterritoriality jurisprudence as most recently enunciated in *Morrison*, and warrants review on this basis, too.

## III.   THE PETITION PRESENTS A PURELY LEGAL DISPUTE ON A RECURRING ISSUE OF CRITICAL IMPORTANCE TO THE FOREIGN POLICY CONCERNS OF THE UNITED STATES

The importance of the issue presented by this petition is clear: in the last six years, the United States has filed at least six briefs as *amicus curiae* in which it has presented its view that the FSIA restricts post-judgment discovery of property of a foreign sovereign, and that failing to recognize the FSIA's limitations on such discovery could cause grave harm to the foreign relations of the United States and the treatment of the United States in litigation abroad.[16] Until recently, the

---

[16] *See, e.g.*, U.S. *Rubin* Certiorari *Amicus*, 2012 WL 1891593, at *11–12; Brief for the United States of America as *Amicus Curiae* in Support of Reversal, *NML Capital, Ltd. v. Banco Central de la*

27

courts of appeals had uniformly agreed with this position; now the Second Circuit has clearly rejected it, and this Court should grant review to protect the important interests the United States has raised.

This petition squarely presents this issue: the Extraterritorial Asset Discovery Order targets property outside the United States that could not under any circumstances be the subject of execution under the FSIA. As the Second Circuit acknowledged, NML has "already obtained discovery on Argentina's assets in the United States, and so the new information it will receive pursuant to the Discovery Order relates *only* to Argentina's assets abroad." *See NML Capital*, 695 F.3d at 207 n.6 (Pet. App. A at 11 n.6) (emphasis added). Whether the FSIA prevents this is a pure question of law that this Court should resolve.

Apart from the issue of statutory interpretation, the United States has repeatedly emphasized that limiting discovery in accordance with the substantive limits of Sections 1609 and 1610 of the FSIA is necessary to advance the comity and reciprocity that underlie the FSIA and are an important part of United States policy. As made clear by the United States, extensive

_____

*República Argentina*, No. 10-1487-cv(L), 2010 WL 4597226, at *9–10 (2d Cir. Nov. 3, 2010); U.S. *FG Hemisphere Amicus*, 2010 WL 4569107, at *28–29; U.S. *Rubin* 7th Cir. *Amicus*, 2009 WL 8132813, at *13–15; Brief for the United States of America as *Amicus Curiae* in Support of Affirmance at 24 n.5, *Peterson v. Islamic Republic of Iran*, No. 08-17756 (9th Cir. June 25, 2009) (hereinafter "U.S. *Peterson Amicus*"); Third Statement of Interest of the United States, *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill. Nov. 16, 2007).

28

discovery into a foreign state's assets may be regarded as an affront to, or "impugn[,] the state's dignity," damaging the relationships of the United States with other nations. U.S. *Rubin* Certiorari *Amicus*, 2012 WL 1891593, at *11–12; *see also* U.S. *Peterson Amicus* at 24 n.5 ("U.S. court orders permitting private litigants to take discovery from foreign states regarding their worldwide assets, even though those assets are not within the court's execution authority under the FSIA, could cause harm to our foreign relations."). Moreover, "'some foreign states base their sovereign immunity decisions on reciprocity;'" *i.e.*, the treatment provided to foreign sovereigns by United States courts. U.S. *Rubin* Certiorari *Amicus*, 2012 WL 1891593, at *12 (quoting *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984)). Accordingly, expansive discovery on the assets of a foreign state may have consequences for the "extensive" property held by the United States overseas "as part of its worldwide diplomatic and security missions." *Id*. These well-founded concerns further argue for review by this Court.

29

## CONCLUSION

For the reasons set forth above, a writ of certiorari should be granted.

Respectfully submitted,

JONATHAN I. BLACKMAN
   *Counsel of Record*
CARMINE D. BOCCUZZI
DANIEL J. NORTHROP
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
jblackman@cgsh.com
cboccuzzi@cgsh.com
dnorthrop@cgsh.com

*Attorneys for Petitioner*
*The Republic of Argentina*

January 7, 2013